E-FILED
Tuesday, 23 June, 2020  10:23:22 AM
Clerk, U.S. District Court, ILCD

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF ILLINOIS**
**URBANA DIVISION**

| | | |
|---|---|---|
| **LARRY CLAPP, MARY JONES, DARYL McCLEARY, and ROBIN McGUIRE, on behalf of themselves and all others similarly situated,** | ) ) ) ) ) | |
| **Plaintiffs,** | ) | |
| **v.** | ) | **Case No. 17-CV-2097** |
| | ) | |
| **ACCORDIA LIFE AND ANNUITY COMPANY and ALLIANCE-ONE SERVICES, INC.,** | ) ) ) ) | |
| | ) | |
| **Defendants.** | ) | |

<u>**ORDER**</u>

Plaintiffs Larry Clapp, Mary Jones, Daryl McCleary, and Robin McGuire (collectively "Plaintiffs") brought a class action lawsuit against Defendants Accordia Life Annuity Company and Alliance-One Services, Inc., seeking damages and injunctive relief after Defendants experienced "Conversion-Related Issues" that were the result of moving the administration of new and existing insurance policies to a new electronic system. The parties have now reached a settlement and submitted, for court approval, a Motion for Final Approval of Class Action Settlement (#54) and Motion for Award of Attorneys' Fees to Class Counsel and for Incentive Awards to Class Representatives (#47). For the following reasons, those motions (#54, 47) are GRANTED.

BACKGROUND[1]

<u>Overview</u>

This class action litigation arises out of "Conversion-Related Issues" accompanying the transfer of Defendant Accordia Life and Annuity Company's ("Accordia") administration of existing and new insurance policies to a new electronic system.

In 2013, about a half a million insurance policies were purchased by Accordia. Accordia hired Defendant Alliance-One to administer and service the policies. In 2015, Alliance-One was trying to go through the process of taking the policies from one administrative system to another, a process known as "conversion." Problems with the conversion process quickly arose, leading policies to be placed on "restricted status," where the policy was essentially frozen and no transactions could be completed regarding the policy for months and then years.

These Conversion-Related Issues resulted in various repercussions for policyholders. During the conversion period, Defendants stopped automatically withdrawing or accepting premium payments, which caused issues ranging from lapsed policies to an inability to provide policyholders with basic information related to the statuses and values of their policies. As a consequence, Plaintiffs brought two class action lawsuits against Defendants: this instant case, in the Central District of Illinois,

---

[1] This background is informed by the filings of the parties, the exhibits attached to those filings, and the representations of the parties' counsel at the final approval hearing on December 2, 2019.

2

and a case in the Central District of California.  After the settlement agreement was

reached, the California case was dismissed by agreement, and a First Amended

Complaint (#35) ("FAC") was filed in this court on March 22, 2019.

Plaintiffs' First Amended Complaint

The class complaint was brought on behalf of all named Plaintiffs and all others

similarly situated against Defendants, and alleged as follows:

In 2013, Athene Annuity and Life Company ("Athene") sold most of its life

insurance business to Defendant Accordia.  Athene continued to administer the

business until late 2015 when Accordia assumed administration of the business.

Accordia hired Defendant Alliance-One, a third-party insurance administrator, to

administer its life insurance contracts.  Alliance-One was responsible for collecting

premium payments via electronic funds transfer ("EFT").  Accordia represented to

Plaintiffs (and the class) that the change in ownership from Athene to Accordia would

not impact the collection of EFT from insureds or billing or depositing of premium

payments.

Plaintiffs allege that Defendants "engaged in a widespread and coordinated

scheme to purposefully lapse or cause the cancellation or conversion of insurance

policies owned by consumers."  Plaintiffs allege that Defendants carried out this scheme

by failing to bill, collect, and apply payments from Plaintiffs and other insureds despite

having an agreement between the parties to automatically debit Plaintiffs' checking

accounts for the monthly premiums.  Plaintiffs then go on to allege the various harms

this caused to the named Plaintiffs, along with allegations applicable to the class as a whole.  Plaintiffs allege five counts: unfair and deceptive trade practices/consumer fraud; unlawful, unfair, and fraudulent business practices; breach of contract; breach of the duty of good faith and fair dealing; and negligence.

Plaintiffs' goal in bringing the suit was to put policyholders in the position they should have been in had the conversion process gone as planned, so that policyholders' policy statuses, non-forfeiture statuses, and policy values would be correct.  If policyholders suffered some sort of out-of-pocket expense or loss due to the Conversion-Related Issues, the litigation aimed to recover compensation for the policyholders because they should not have had to suffer those expenses due to Defendants' actions.

Preliminary Order of Settlement

On May 10, 2019, the parties filed a Motion for Preliminary Approval of Class Action Settlement (#42).  On June 7, 2019, this court entered an Order (#44) granting the preliminary settlement approval motion.

First, the court certified the class.  The class comprised all persons who have or had an ownership interest in a covered policy or policies, or any executors or representatives of a deceased settlement class member's estate during the covered policy period.  The class was certified for the sole purpose of consummating the settlement.  The court found that the class met all requirements of Federal Rule of Civil Procedure 23(a) and (b)(3).  The court found class counsel and the named Plaintiff class

4

representatives to be adequate representatives of the class pursuant to Rule 23.  The

court found that, preliminarily, the settlement was fair, reasonable, and adequate.  The

matter was set for a final approval hearing on December 2, 2019.

The preliminary approval order also set in place the procedure for sending notice

of the settlement to all members of the class, and informed them about the final

approval hearing and the objection process.  The order also informed the class on the

procedure for participation and exclusion from the class.

Between June 7 and December 2, 2019, four objections (#46, 49, 52, 53), including

a letter concerning exclusion from the settlement (#45), were filed.  A fifth objection

(#64) was also filed February 24, 2020.  Plaintiffs filed a Motion for Attorneys' Fees (#47)

on October 25, 2019, followed by the parties' Motion for Final Approval of the Class

Action Settlement (#54) on November 18, 2019.  On that same day the court allowed the

California Department of Insurance's amicus brief (#56) in opposition to final approval

of the settlement to be filed with the court.  A hearing was held regarding final approval

of the settlement before this court on December 2, 2019.  No objectors were present at

the hearing, nor was any representative from the California Department of Revenue.

The court took the pending motions under advisement.

<u>The Parties' Motion for Final Approval (#54)</u>

The parties' Motion for Final Approval of Class Action Settlement (#54) states as follows:

**What the Settlement Provides**

The settlement provides both injunctive relief and claim review relief to the class members.  The parties contend the settlement remedies Conversion-Related Issues and compensates policyholders for out of pocket losses caused by these issues.  The relief is both monetary and non-monetary.

Injunctive Relief (Settlement Agreement § IV):

An automatic 24-month period to repay missed premium payments, if requested by the policyholder;

An automatic back-dating of premium payments so that policyholders receive retroactive fixed interest on their policies;

An automatic adjustment of any policy inappropriately in MEC[2] status (a negative tax implication status) to a non-MEC status;

_____

[2]"'Modified endowment contract (MEC) is the term given to a life insurance policy whose funding has exceeded federal tax law limits' and thereby is no longer considered to be a life insurance contract by the IRS. INVESTOPEDIA, Akhilesh Ganti, Modified Endowment Contract (updated Sept. 13, 2019), https://www.investopedia.com/terms/m/modified-endowment-contract.asp (last visited September 29, 2019).  One consequence of a life insurance policy's becoming a modified endowment contract is the loss of preferable tax treatment used for life insurance policies." *Pape v. Braaten*, 2019 WL 4750036, at *4 n.6 (N.D. Ill. Sept. 30, 2019).

An automatic correction of any incorrect non-forfeiture status (for example, a whole or universal life policy that had been incorrectly converted to a term policy will be restored to its original status);

An automatic review and remediation of any policies that were lapsed without the proper notice being provided and an opportunity to reinstate such policies after notice; and

Performance of the Independent Testing Plan, designed to identify Conversion-Related Issues, which Defendants are required to remedy.

Claim Review Relief (Settlement Agreement § V):

A refund of bank overdraft charges caused by an inaccurate premium draft;

An adjustment of any incorrect premium payments, interest deductions, cost of insurance charge, death benefits, and surrender charges, and other incorrect policy payments or charges;

A partial or total waiver of past due premium payments and other policy payments or charges if paying the past due premium or other charges present a hardship to the policyholder;

Refunds necessary to implement any inappropriate non-forfeiture status reversals or reimbursement for tax payments made due to distributions taken when in MEC status that the settlement class member asserts were improper and directly caused by Conversion-Related Issues;

More than 24 months to pay back any back due premium, if paying within 24 months poses a hardship;

Access to policy information that the policyholder was not previously able to acquire;

Recalculation of a policy's cost basis for tax reporting purposes; and

Any other requests for adjustments or information related to conversion-related issues.

The parties, in the motion, stated that the benefits of the settlement were only reached after multiple in-person mediation sessions and months of negotiations. Further, the parties made it clear what the settlement does *not* do. The parties state that the settlement does not alter or release contractual rights for the express written benefits that are due or that will become due under the terms of the policies, except to the extent the issues are remedied by the settlement. Further, the settlement expressly provides that "state and federal government officials or agencies shall retain all regulatory and enforcement powers."

The parties also described the system the settlement establishes to ensure that settlement benefits reach the class and that Conversion-Related Issues are corrected. This centers around the Independent Testing Plan ("ITP"). For retroactive fixed interest issues, Accordia scanned all policies that could have been potentially impacted and, if the premium payment should have been backdated and retroactive interest paid, it has done so. Class members were not required to do anything to obtain this relief.

8

Accordia also reviewed and tested systemic changes to ensure correct death benefit determinations and implemented procedures to ensure that lapse statuses are proper and that non-forfeiture statuses are proper.

A major component of the settlement is the Claim Review Relief. The parties state that Accordia has assigned more than 75 employees to answer calls related to the Settlement, and that those employees received training and instruction regarding the implementation of the settlement. These employees will have access to detailed customer information and see that customers are directed to the appropriate personnel to resolve their issues and research their policies.

The parties then detailed the claim review process and different levels of review. As part of the process, the Settlement Administrator, Rust Consulting[3], has authority to grant certain claims without any review from Accordia. However, if the claim is outside the Administrator's authority, it goes to Accordia's Initial Review Team ("IRT"), which is comprised of 30 members, who research the policy, payment history, and claim request to evaluate the aspects of the class member's policy. If the claim is approved by the IRT, arrangements are made to implement the relief. IRT members go through a two-week training course with senior members regarding the settlement, and then conduct policy research under the guidance of a senior member.

---

[3]Rust Consulting, the Settlement Administrator, is a third party with experience in nationwide class actions involving insurance products and notice process.

Claims that are rejected by the IRT, or that exceed the IRT's authority, move on to a next step, where they are evaluated by the Escalated Review Team ("ERT"). The ERT is comprised of a senior vice president for compliance, legal department personnel, and an associate level employee, all of whom are highly experienced with the issues that have arisen due to the conversion process.

It should be mentioned that § VI.B.9(a) of the settlement states that, to be eligible to make a claim, a claim form must acknowledge that the class member attempted to resolve any Conversion-Related Issue by calling he customer call center first. However, the parties, referencing the deposition of Accordia's vice president of the customer experience Amanda Harless, state that Accordia has not rejected any class member's claim for failure to contact the customer contact center first. Instead, Accordia processes the claim as though the precondition has been satisfied. Further, if a claim is received lacking required information, Accordia does not automatically treat the claim as deficient, but rather reaches out to the customer to understand the issue or concern and attempt to resolve it.

If a claim has been denied by the Settlement Administrator, IRT, and finally ERT, the class member has the option to appeal the denial to a third party neutral, retired federal judge Nancy Gertner, who makes a final binding decision.

Class counsel Vess A. Miller declared that the claim period lasts 18 months so that class members have opportunity to obtain information and review any issues they may have, and that class counsel has tested the claims process to ensure that the process is usable and effective.  Class counsel also declared that he has responded to numerous calls from policyholders and will continue to do so in the future.

The parties state that the response of class members to the settlement has been "overwhelmingly favorable."  The basis for this statement is the Declaration of Jason Stinehart, attached as Exhibit 5 to the Memorandum In Support of Plaintiffs' Motion for Final Approval of Class Action Settlement (#55).  Stinehart works as a program manager for Rust Consulting, the Settlement Administrator.  Stinehart declares that the Settlement Administrator mailed notice to the U.S. Attorney General, and to the offices of 56 state and U.S. territory insurance regulators, informing them of the proposed settlement, in compliance with 28 U.S.C. § 1715, the Class Action Fairness Act ("CAFA").  The notice included the complaint and other documents related to the suit. The parties note that no regulator objected to the settlement, and only the California Department of Insurance filed any response to the settlement.

Stinehart declares that the Settlement Administrator established a toll-free call center, website with settlement information, and provided direct mail notice to the class members.  This notice informed them of the terms of the settlement and their rights to opt-out or object to the settlement.  A bulletin was also distributed to over 47,000 insurance agents informing them of the settlement.  Stinehart declares that the notice program was highly successful, with approximately 98.9% of all class members reached.

The parties state, per Stinehart's declaration, that the deadline to object or opt-out of the settlement passed on November 4, 2019, and, out of nearly half a million settlement class members, only five members objected and only 209 class members requested to be excluded, meaning that over 99.9% of all class members decided to receive the benefits of the settlement and just 0.001% of all settlement class members have objected.

## ANALYSIS

A district court may approve a settlement of a class action "only if it holds a hearing and finds that the proposed resolution 'is fair, reasonable, and adequate.'" *Camp Drug Store v. Cochran Wholesale Pharmaceutical, Inc.*, 897 F.3d 825, 830 (7th Cir. 2018), quoting Fed.R.Civ.P. 23(e)(2).  "Under Seventh Circuit law, a district court must, in evaluating the fairness of a settlement, consider 'the strength of plaintiffs' case compared to the amount of defendants' settlement offer, an assessment of the likely complexity, length and expense of the litigation, an evaluation of the amount of opposition to settlement among affected parties, the opinion of competent counsel, and

12

the stage of the proceedings and the amount of discovery completed at the time of settlement.'" *In re Capital One Telephone Consumer Protection Act Litigation*, 80 F.Supp.3d 781, 788 (N.D. Ill. 2015), quoting *Synfuel Techs., Inc. v. DHL Express (USA), Inc.*, 463 F.3d 646, 653 (7th Cir. 2006).

I.      FINAL APPROVAL OF THE SETTLEMENT

*Certification of the Class*

The court certified the class for the sole purpose of consummating the settlement in its Order (#44) of June 7, 2019.  The court reiterates and confirms certification of the settlement class in this Order, explaining the basis for certification of the settlement class.

A court's analysis of class certification 'is not free-form, but rather has been carefully scripted by the Federal Rules of Civil Procedure.'" *Gehrich v. Chase Bank U.S.A., N.A.*, 316 F.R.D. 215, 223 (N.D. Ill. 2016), quoting *Chicago Teachers Union, Local No. 1 v. Board of Education of the City of Chicago*, 797 F.3d 426, 433 (7th Cir. 2015).  "A district court may certify a case for class-action treatment only if it satisfies the four requirements of Federal Rule of Civil Procedure 23(a)—numerosity, commonality, typicality, and adequacy of representation—and one of the conditions of Rule 23(b)." *McCaster v. Darden Restaurants, Inc.*, 845 F.3d 794, 800 (7th Cir. 2017).  Here, the parties argue the condition of Rule 23(b)(3) is met, where "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed.R.Civ.P. 23(b)(3).

13

Numerosity

The numerosity requirement requires that a class be "so numerous that joinder of all members is impracticable." Fed.R.Civ.P. 23(a)(1). A class can be certified without determination of its size, so long as it's reasonable to believe it large enough to make joinder impracticable and thus justify a class action suit, and, while there is no magic number that applies to every case, a forty–member class is often regarded as sufficient to meet the numerosity requirement. *Orr v. Shicker*, 953 F.3d 490, 497-98 (7th Cir. 2020).

Here, as noted above, there are nearly half a million covered policies in the proposed class, meaning there are more than enough members to satisfy the numerosity requirement of Rule 23(a)(1).

Commonality

The commonality requirement requires the plaintiffs to show that "there are questions of law or fact common to the class[.]" Fed.R.Civ.P. 23(a)(2). With regard to commonality, the Seventh Circuit has stated:

> A court need find only a single common question of law or fact, but it needs to identify more than the fact that everyone suffered as a result of a violation of the same provision of law. Plaintiffs' claims "must depend upon a common contention ... of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." The key to commonality is "not the raising of common 'questions' ... but, rather, the capacity of a class-wide proceeding to generate common answers apt to drive the resolution of the litigation." "Dissimilarities within the proposed class are what have the potential to impede the generation of common answers."

*Orr*, 953 F.3d at 498-99 (citations omitted).

14

The court finds that the commonality requirement has been met.  As noted by the parties, common questions exist as to breach of contract and negligence, and finds that a common nucleus of operative facts, such as the errors in the conversion process that led to the Conversion-Related Issues for those policyholders in the class, underlies the common questions of Defendants' liability.  See *Blow v. Bijora, Inc.*, 855 F.3d 793, 806 (7th Cir. 2017).  There may be some differences between class member policyholders that the *effect* of the Conversion-Related Issues had on the members, but the operative facts from which this litigation sprang remain common across the class.  Further, "factual variations among class members' grievances do not defeat a class action."  *Keele v. Wexler*, 149 F.3d 589, 594 (7th Cir. 1998); *Flynn v. FCA US LLC*, 327 F.R.D. 206, 222 (S.D. Ill. 2018).  The injury to the class members is the same, and the court believes that the settlement proposed by the parties, including the injunctive relief and claim review process, will resolve the class members' claims on a class-wide basis, as the court will more fully explain below.  See *Flynn*, 327 F.R.D. at 222.  The commonality requirement has been met.

Typicality

To fulfill the typicality requirement, the plaintiffs must show that the "claims or defenses of the representative parties are typical of the claims or defenses of the class[.]" Fed.R.Civ.P. 23(a)(3).  In analyzing typicality, the Seventh Circuit has stated that "[a] claim is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members and her claims are based on the same

legal theory." *Arreola v. Godinez*, 546 F.3d 788, 798 (7th Cir. 2008). Thus, "[e]ven though some factual variations may not defeat typicality, the requirement is meant to ensure that the named representative's claims have the same essential characteristics as the claims of the class at large." *Arreola*, 546 F.3d at 798. "The issue of typicality is closely related to commonality and should be liberally construed." *Saltzman v. Pella Corp.*, 257 F.R.D. 471, 479 (N.D. Ill. 2009), citing *Keele*, 149 F.3d at 595. "A 'plaintiff's claim is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members and his or her claims are based on the same legal theory.'" *Keele*, 149 F.3d at 595, quoting *De La Fuente v. Stokely-Van Camp, Inc.*, 713 F.2d 225, 232 (7th Cir. 1983).

Plaintiffs have met the typicality requirement in this case. The named Plaintiffs and class members' claims all derive from the same operative facts: their insurance polices are administered by Defendants and they suffered injury as a result of Conversion-Related Issues during the class period. See First Amended Complaint (#35), ¶¶ 15-52.

<u>Adequacy</u>

The final Rule 23(a) requirement, adequacy, requires that the plaintiffs show that "the representative parties will fairly and adequately protect the interests of the class." Fed.R.Civ.P. 23(a)(4). "A class representative must be part of the class and must 'possess the same interest and suffer the same injury' as the other class members." *Orr*, 953 F.3d at 499, quoting *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348 (2011). "A

representative might be inadequate if he is subject to a substantial defense unique to him." *Beaton v. SpeedyPC Software*, 907 F.3d 1018, 1027 (7th Cir. 2018). In addition, the court must be satisfied that the named plaintiffs will keep the interests of the entire class at the forefront. *Conrad v. Boiron, Inc.*, 869 F.3d 536, 539 (7th Cir. 2017). Further, "[a] class is not fairly and adequately represented if class members have antagonistic or conflicting claims." *Riffey v. Rauner*, 873 F.3d 558, 563-64 (7th Cir. 2017), vacated and remanded on other grounds by *Riffey v. Rauner*, 138 S.Ct. 2708 (2018).

The named Plaintiffs, as stated in the First Amended Complaint and the filings of the parties, are part of the class and have the same interests and suffered the same injuries as the other class members: they were policyholders during the relevant period and were injured due to Conversion-Related Issues in that their policies lapsed. The court cannot find, and indeed none of the objectors or California in their brief have argued, that the named Plaintiffs have unique defenses applicable only to themselves, and there is nothing in the named Plaintiffs' claims that are antagonistic or conflicting with those of the other class members. The court finds the named Plaintiffs adequately and fairly represent the class as a whole.

Finally, the court has found no evidence to contradict the parties' assertion that Plaintiffs' counsel are experienced and reputable litigators in the field of class action litigation, and thus are qualified, experienced, and able to conduct the litigation. See *Gammon v. GC Services, Ltd. Partnership*, 162 F.R.D. 313, 317 (N.D. Ill. 1995). Plaintiffs have satisfied Rule 23(a).

17

Rule 23(b)(3)

After meeting the conditions of Rule 23(a), to complete certification of a class, the class must satisfy one of the four conditions in Rule 23(b).  *Bell v. PNC Bank, National Association*, 800 F.3d 360, 373 (7th Cir. 2015).  The parties posit that the class satisfies Rule 23(b)(3).  "Rule 23(b)(3) class actions are designed to 'cover cases in which a class action would achieve economies of time, effort, and expense, and promote uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results.'"  *Suchanek v. Sturm Foods, Inc.*, 764 F.3d 750, 759 (7th Cir. 2014), quoting *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 615 (1997).  A class action is the efficient procedure for litigation of a case involving a defect that may have imposed costs on tens of thousands of consumers, yet not a cost on any one of them large enough to justify the expense of an individual suit.  *Suchanek*, 764 F.3d at 759.

To obtain certification of a class action under Rule 23(b)(3), a plaintiff must establish that "the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  *Amigen, Inc. v. Connecticut Retirement Plans and Trust Funds*, 568 U.S. 455, 460 (2013), citing Fed.R.Civ.P. 23(b)(3).

"The matters pertinent to these findings include: (A) the class members' interests in individually controlling the prosecution ... of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class

18

members; (C) the desirability or undesirability of concentrating the litigation of the

claims in the particular forum; and (D) the likely difficulties in managing a class action."

Fed.R.Civ.P. 23(b)(3)(A-D).

The court will first examine the predominance question. Rule 23(b)(3) permits

class certification only if the questions of law or fact common to class members

"predominate" over questions that are individual to members of the class, and there is

no mathematical or mechanical test for evaluating predominance. *Messner*, 669 F.3d at

814. While similar to Rule 23(a)'s requirements for typicality and commonality, the

predominance criterion is far more demanding. *Messner v. Northshore University*

*HealthSystem*, 669 F.3d 802, 814 (7th Cir. 2011). Rule 23(b)(3)'s predominance

requirement is satisfied when common questions represent a significant aspect of a case

and can be resolved for all members of a class in a single adjudication. *Messner*, 669

F.3d at 815. Put another way, common questions can predominate if a common nucleus

of operative facts and issues underlies the claims brought by the proposed class:

> If, to make a prima facie showing on a given question, the members of a
> proposed class will need to present evidence that varies from member to
> member, then it is an individual question. If the same evidence will suffice
> for each member to make a prima facie showing, then it becomes a
> common question. Individual questions need not be absent. The text of
> Rule 23(b)(3) itself contemplates that such individual questions will be
> present. The rule requires only that those questions not predominate over
> the common questions affecting the class as a whole.

*Messner*, 669 F.3d at 815 (citation omitted).

19

The court agrees with the parties that common questions clearly predominate over individual questions in this case.  While there may be minor individual questions, such as the impact on each class member policyholder of the Conversion-Related Issues (such as whether they lapsed for one period or more, whether they were overdrawn at the bank, whether they are entitled to only monetary or injunctive relief), every class member injury resulted from the same core of operative facts: problems with their policies due to the Conversion-Related Issues.  That question, and evidence related to it, drives this litigation and lies at its heart.  It is why the litigation was brought in the first place.  This common nucleus of operative facts underlies all of the claims in this case. See *Messner*, 669 F.3d at 815.  Plaintiffs have shown that common questions of law and fact predominate, in that Defendants engaged in standardized conduct that violated laws and was tortious, and that the class and any subclasses will therefore be cohesive. See *In re AT&T Mobility Wireless Data Services Sales Litigation*, 270 F.R.D. 330, 345 (N.D. Ill. 2010), citing *Amchem Products*, 521 U.S. at 623.

Further, the court agrees that a class action is superior to other available methods of resolving the controversy. The proposed class is in the hundreds of thousands, which does raise manageability questions, however such concerns are irrelevant when considering a settlement-only class certification, as is requested here.  See *Amchem Products*, 521 U.S. at 620.  A class action is the efficient procedure for litigation of a case involving a defect that may have imposed costs on tens of thousands of consumers, yet not a cost on any one of them large enough to justify the expense of an individual suit.

*Suchanek*, 764 F.3d at 759.  That is certainly the case here.  The class numbers nearly

500,000 members, and costs were imposed on them due to a common defect.  Yet, for

some class members, the costs imposed can be remedied by mere injunctive relief.  For

others, they may be entitled to monetary relief through the claim review process.

However, the costs imposed for a majority of the class members would not justify the

costs that would be incurred on them through individual, piecemeal litigation.  The

universal settlement resolution in this case is the most fair and efficient means of

resolving this for the class.  The superiority requirement has been met.

Taking all the factors of Rule 23 into consideration, the court finds that, based on

the common question presented and the class at issue, "it will certainly be efficient and

fair to answer the question once for all plaintiffs rather than in piecemeal litigation."

See *Chicago Teachers Union, Local No. 1*, 797 F.3d at 444.  The class meets the

requirements for certification under Rule 23.

*Final Approval of the Settlement*

Having affirmed certification of the class, the court now turns to the parties'

Motion for Final Approval of Class Action Settlement (#54).  Whereas no opposition

was registered to the certification of the class, the California Department of Insurance

has filed an amicus brief (#56) opposing final approval of the settlement, and a number

of class members have filed objections to settlement approval and the requested

attorneys' fees.  The court will first determine whether the settlement is fair, reasonable,

and adequate under Rule 23(e)(2), taking into account California's amicus brief, and

then address the class members' objections.

21

A court may approve a settlement that would bind class members only if, after proper notice and a public hearing, the court determines that the proposed settlement is "fair, reasonable, and adequate." *Gehrich*, 316 F.R.D. at 227. A trial judge's instinct, in our adversarial system of legal justice, is to approve a settlement, trusting the parties to have negotiated to a just result as an alternative to bearing the risks and costs of litigation. *Redman v. RadioShack Corp.*, 768 F.3d 622, 629 (7th Cir. 2014). However, the law requires more than a judicial rubber stamp when the lawsuit that the parties have agreed to settle is a class action, because of the built-in conflict of interest in class action suits. *Redman*, 768 F.3d at 629. Rather, the Seventh Circuit has characterized "the court's role as akin to the high duty of care that the law requires of fiduciaries." *Wong v. Accretive Health, Inc.*, 773 F.3d 859, 862 (7th Cir. 2014). The district court must also be on guard for evidence of collusion between the defendants, class representatives, and class counsel. See *CE Designs, Ltd. v. King Supply Co.*, 791 F.3d 722, 725 (7th Cir. 2015). Still, courts evaluating the fairness of the settlement of a class action consider the facts in the light most favorable to the settlement. *Isby v. Bayh*, 75 F.3d 1191, 1199 (7th Cir. 1996); *Douglas v. Western Union Co.*, 328 F.R.D. 204, 214 (N.D. Ill. 2018).

The current proposed settlement would bind class members, therefore the court may approve it only after a hearing and only on finding that it is fair, reasonable, and adequate. Fed.R.Civ.P. 23(e)(2). The court held the hearing on the final approval of the settlement on December 2, 2019. The court must now determine whether the settlement was fair, reasonable, and adequate.

>In making this determination, Rule 23(e)(2) requires the Court to consider whether (1) the class representatives and class counsel have adequately represented the class, (2) the proposal was negotiated at arm's length, (3) the proposal treats class members equitably relative to each other, and (4) the relief provided by the settlement is adequate. Fed. R. Civ. P. 23(e). In addition, courts in the Seventh Circuit consider the following five factors: (1) the strength of the plaintiffs' settlement offer; (2) the complexity, length, and expense of continued litigation; (3) the amount of opposition to the settlement; (4) the opinion of experienced counsel; and (5) the stage of the proceedings and the amount of discovery completed. *Synfuel Techs., Inc. v. DHL Express (USA), Inc.*, 463 F.3d 646, 653 (7th Cir. 2006) (internal citation omitted). In making their decisions, courts should "consider the facts in the light most favorable to settlement." *Isby v. Bayh*, 75 F.3d 1191, 1199 (7th Cir. 1996) (internal quotation marks omitted). This does not mean a court should rubberstamp a settlement agreement, however; instead, courts must remain vigilant for any evidence of collusion between the defendants, the named plaintiff, and class counsel. See *Eubank v. Pella Corp.*, 753 F.3d 718, 720 (7th Cir. 2014).

*Charvat v. Valente*, 2019 WL 5576932, at *5 (N.D. Ill. Oct. 28, 2019).

The considerations from Rule 23(e)(2) overlap with the factors articulated by the Seventh Circuit in *Synfuel*. *Hale v. State Farm Mutual Automobile Ins. Co.*, 2018 WL 6606079, at *2 (S.D. Ill. Dec. 16, 2018). All of these factors, whether in Rule 23 or Seventh Circuit jurisprudence, favor approval of the settlement.

A.     Adequacy of Representation- Rule 23(e)(2)(A) and the Seventh Circuit's Fourth Factor

First, regarding the named class representatives, the court found the representatives adequate in its Order (#44) of June 7, 2019, granting preliminary approval to the settlement. The court agreed with the parties that the named representatives, being class members who all had policies from Defendants during the class period and were injured due to the flawed conversion process, had sufficient

23

interest in the outcome of this case to ensure vigorous advocacy, and did not have interests that would conflict with other class members.  See *Holtzman v. Turza*, 2009 WL 3334909, at *5 (N.D. Ill. Oct. 14, 2009).  The court further agreed that the named representatives had claims entirely consistent with those held by the settlement class, and that they have vigorously advocated for the settlement class members.  Nothing in the interim period leads the court to reconsider that judgment.

Next, the court also finds that the class counsel adequately represented the interests of the class.  As will be more fully discussed in the attorneys' fees section, class counsel are experienced class action litigators. Based upon the record before the court, class counsel zealously and competently represented the class throughout three years of intense and voluminous discovery, negotiation, and mediation to arrive at the current settlement.  Indeed, class counsel Miller declares that, in order to ensure an efficient settlement process, he attended initial training sessions of personnel of both the settlement administrator and Defendants.  Miller further declares that he has been involved in review and approving various call scripts, frequently asked questions, and other materials relating to the Claims Review Process.  Miller declares that he has responded to over 100 calls from policyholders, assisting them with questions about the settlement, and will continue to do so in the future.  The court finds that class counsel has more than adequately represented the class.  See *Charvat*, 2019 WL 5576932, at *5.

The court also finds that the Seventh Circuit's fourth factor, "opinion of competent counsel," *Synfuel*, 463 F.3d at 653, has been met, as class counsel are experienced class action litigators "who strongly support the settlement[.]" See *Charvat*, 2019 WL 5576932, at 8.

The Rule 23(e)(2)(A) and opinion of competent counsel factors favor settlement approval.

B.    Arm's Length Negotiation- Rule 23(e)(2)(B) and the Seventh Circuit's Collusion Concerns

Rule 23(e)(2)(B) requires that the court consider whether the proposed settlement was "negotiated at arm's length."  Similarly, the Seventh Circuit has warned about collusion between counsel, due to "the incentive of class counsel, in complicity with the defendant's counsel, to sell out the class by agreeing with the defendant to recommend that the judge approve a settlement involving a meager recovery for the class but generous compensation for the lawyers—the deal that promotes the self-interest of both class counsel and the defendant and is therefore optimal from the standpoint of their private interests." *Eubank v. Pella Corp.*, 753 F.3d 718, 720 (7th Cir. 2014).

Class counsel Miller declares, and the court, examining the record in this case finds no reason to doubt, that the settlement was the product of extended arm's-length negotiations between seasoned attorneys on both sides.  This settlement was reached only after class counsel had already conducted a thorough, pre-suit investigation, consulted with an actuarial expert, and substantially investigated Defendants' claims procedures in order to understand the Conversion-Related Issues.  As noted above,

class counsel Miller was heavily involved in Defendants' employee training sessions regarding the mechanics of implementing the settlement, as well as discovery to establish that those new mechanisms were working properly.

Importantly, per Miller's declaration, "the parties' exchange of all information needed to evaluate and inform the settlement discussions was guided by an experienced and respected mediator, Professor Eric Green." "... [T]he involvement of a neutral or court-affiliated mediator or facilitator in those negotiations may bear on whether they were conducted in a manner that would protect and further the class interests." Fed.R.Civ.P. 23(e)(2)(A), (B) cmt.; see also *Wong*, 773 F.3d at 864 (district court did not abuse discretion in approving settlement reached, among other factors, through extensive arm's-length negotiations with an experienced third-party mediator).

Professor Eric Green is listed on the United States District Court for the District of Puerto Rico's website as a mediator "approved by the Mediator Selection Committee." prd.uscourts.gov/list-mediators (last visited May 27, 2020). Clicking on Professor Green's link on that page reveals he is a co-founder of Resolutions, LLC, of Boston, Massachusetts, an arbitration and ADR provider, and that he also serves "as the court appointed Special Master, Futures Representative and Guardian Ad Litem in class or mass claimant matters." A full biography of Professor Green's credentials, qualifications, and accomplishments can be found on the Resolutions, LLC website. resolutionsllc.com/principals.htm (last visited May 27, 2020). Needless to say, Professor Green is a highly qualified and experienced mediator in the field of class

action litigation.  His guidance and participation in mediating this matter between the parties, and reviewing their settlement agreement, demonstrates that this matter was negotiated at arm's length and absent any collusion between the parties' counsel to the detriment of the class.  See *Wong*, 773 F.3d at 864.  This factor strongly weighs in favor of approval.

C.       Adequacy of Relief Provided- Rule 23(e)(2)(C) and the Seventh Circuit's <u>First Two Factors</u>

Rule 23(e)(2)(C), which requires the court to consider whether the relief provided for the class is adequate, instructs the court to take into account: the costs, risks, and delay of trial and appeal; the effectiveness of any proposed method of distributing relief to the class, including the method of processing class member claims; the terms of any proposed award of attorneys' fees, including timing of payment; and any agreement required to be identified under Rule 23(e)(3).  Fed.R.Civ.P. 23(e)(2)(C). Because "the factors articulated by the Seventh Circuit subsume most of these factors, the court will consider the adequacy of the settlement's relief against the background of these factors."  *Charvat*, 2019 WL 5576932, at *6, citing *Snyder v. Ocwen Loan Servicing, LLC*, 2019 WL 2103379, at *5 (N.D. Ill. May 14, 2019).

1.    **Strength of Plaintiffs' Case Versus Amount of Defendants' Settlement Offer (Seventh Circuit's First Factor and Rule 23(e)(2)(C)(i) and 23(e)(2)(C)(ii))**

The Seventh Circuit has long held this first factor, the strength of the plaintiff's case balanced against the amount of the defendant's settlement offer, to be the most important. *Wong*, 773 F.3d at 864. The court must estimate the likely outcome of a trial to determine the adequacy of a settlement. *Gehrich*, 316 F.R.D. at 227, citing *Eubank*, 753 F.3d at 727.

Per the declaration of class counsel Miller, which the court has evaluated and found no reason to doubt, "[t]he relief provided by the Settlement compares favorably to the amounts Class members could recover in their best day following trial, balancing the risks and uncertainties of litigation." The court's examination of the settlement bears this statement out. The court would first note that the relief, particularly the injunctive relief, is comprehensive yet also specific and carefully crafted to correct a wide variety of Conversion-Related Issues that individual class members may have.

Further, the claims review process set up by the parties as part of the settlement is intricate in how it works to resolve every possible type of claim that an insured may have due to the Conversion-Related Issues, yet at the same time, is an accessible and, by the court's measure, clear, straightforward process for the class members themselves to follow. The claims review process carefully considers the class members' claims, and provides class members with an essentially uncapped fund to be reimbursed for out-of-pocket losses caused them by Conversion-Related Issues. The parties set up a process

28

containing numerous rounds of review, so that if a class member is not satisfied with the resolution at one round, he can appeal to a higher round.  The final round of review allows a class member to submit their claim to a neutral third-party, a former federal district court judge with no interest in the outcome of the litigation.

Miller declares, and the court agrees, that such a specifically-tailored resolution for the class members would likely not have been available through an adjudicated resolution, whether by the court or by a jury.  The settlement was negotiated by experienced, competent counsel intimately familiar with every aspect of this case, informed by experts to realize a comprehensive resolution that can adequately address all of the types of claims or issues class members may have.  This is a preferable resolution to that which could have been provided by the court, which would likely not have been as specifically tailored and would not have been able to establish a process that could as completely address the class members' claims.

The court would also note that there is no guarantee Plaintiffs would have been successful in adjudication either by court or jury.  Based on Defendants' Answers (#20, 21), Defendants may have had several viable affirmative defenses to the class action, such as adequate disclosure, waiver, failure to mitigate, or estoppel.  Although this matter was not actually litigated, Defendants had at least some colorable arguments that could very well have foreclosed substantial, or even all, recovery for any amount of Plaintiffs and class members.  At the final approval hearing, defense counsel stated that they "believed that they had some solid merits and class certification defenses[.]"  On

29

the other hand, there was a risk to Defendants that they could have been ordered to pay more at trial than they ultimately will via the claims review process.  "There is no reason to believe the parties failed to take these considerations into account when choosing to settle this case."  *Charvat*, 2019 WL 5576932, at *7.

Finally, putting aside the ability of the court or jury to fashion a resolution as adequate as that reached by the parties in the settlement, the court would note that, to obtain the injunctive relief from the settlement of restoring class members' policies to substantially the status they had before the Conversion-Related Issues arose, class members need not do anything at all.  The injunctive relief is automatically provided, with no need to submit a claim form.  To obtain possible monetary or other relief through the claims review process, class members need to make a number of phone calls and maybe fill out the claim form.  Thus, individual class members will receive injunctive relief or "compensation without suffering more than a few calls or having to endure the time, expense, and uncertainty of litigation."  *Charvat*, 2019 WL 5576932, at *6.  The court finds the procedure set up by the parties to effect relief to be claimant-friendly, cost-effective, efficient, and reasonable under the particular circumstances of this case.  See *Hale*, 2018 WL 6606079, at *5.

Given the above, the court concludes that this factor weighs in favor of approving the settlement.

2.      **Complexity, Length, and Expense of Future Litigation (Seventh Circuit's Second Factor and Rule 23(e)(2)(C)(I))**

The court must consider the likely complexity, length, and expense of continued litigation in this matter. *Synfuel*, 463 F.3d at 653. Here, while the parties have apparently engaged in a substantial amount of discovery and fact-finding, both before and after the initiation of this class action lawsuit, they had not yet proceeded to filing motions for summary judgment or preparing for trial. However, there is no reason to doubt the parties' contention that "[h]ad this case not settled, litigation could have continued for years, including numerous appeals." There is a high probability that this would have been a highly contested case, with motions to dismiss, motions for summary judgment, and possibly, a trial, given the stakes and the wide-ranging, complex, and national scope of the issues involved. The likelihood of the parties engaging in substantial motion practice could have resulted in "reducing or negating, and certainly would have [resulted in] delay[ing], any judgment in favor of Plaintiffs, even putting aside the near certainty of appeal[,]" and thus this factor strongly favors approval. See *Gehrich*, 316 F.R.D. at 229-30.

3. **Attorneys' Fees (Rule 23(e)(2)(C)(iii))**

The court analyzes the terms of class counsel's request for attorneys' fees and expenses below. In short, the court finds the requested fees and costs are reasonable and concludes that the relief provided for the class is adequate in light of all the additional factors discussed herein, and thus this factor favors final approval. See *Hale*, 2018 WL 6606079, at *5.

31

4.      **Any Agreement Required to be Identified Under Rule 23(e)(3) (Rule 23(e)(2)(C)(iv))**

Section XIV.E of the settlement identifies a Confidential Side Agreement between the parties holding that if the total number of persons and entities in the settlement class who submit requests for exclusion from the class exceeds the number set forth in the Confidential Side Agreement, Defendants shall have the option, at their own discretion, to unilaterally terminate the settlement in the timeframe set forth in the Confidential Side Agreement.

Such "blow provisions" typically do not disclose the threshold number of opt-outs to required to trigger the provision and are kept confidential to encourage settlement and discourage third parties from soliciting class members to opt out. *In re HealthSouth Corp. Securities Litigation*, 334 Fed.Appx. 248, 250 n.4 (11th Cir. June 17, 2009). While courts may prefer these provisions to be transparent to the class, a settlement that reveals the provision without revealing the trigger point is not fatal to settlement approval, and courts generally approve settlements that contain blow up provisions, likely because, by insuring defendants against bad outcomes, they encourage settlement. 4 H. Newberg on Class Actions, § 13:6 (5th ed. December 2019 update).

Obviously, Defendants have not exercised the walk-away provision in this case. In any event, only 209 class members out of 452,506 opted out of the settlement, a minuscule .046% of the class.

32

D.      Equitable Treatment of Class Members - Rule 23(e)(2)(D)

Rule 23(e)(2)(D) requires that the court consider whether "the proposal treats class members equitably relative to each other." Fed.R.Civ.P. 23(e)(2)(D). The equitable treatment of class members is raised in California's amicus brief opposing final approval of the settlement, which the court will address in more detail below. However, as noted by the parties, the settlement covers *all* policies that were affected by Conversion-Related Issues. It does not just cover policies that were actually converted from one system to another, but, rather, all policies, including those that were converted, and those that did not undergo the conversion process, but were still affected by issues related to that process.

The settlement is a universal one. The differences in available relief relate to the specifics of how each class member was affected by Conversion-Related Issues. While the type or category of relief each class member may receive will be different, the type of relief they will receive and/or be entitled to is specifically tailored to the type of Conversion-Related Issue they experienced. The relief provided is broad enough to cover all class members' Conversion-Related Issues. They have been treated equitably relative to each other based on the type and extent of their individual Conversion-Related Issue, thereby satisfying Rule 23(e)(2)(D). This factor weighs in favor of approval.

     E.    <u>Amount of Opposition- The Seventh Circuit's Third Factor</u>

The Seventh Circuit's third factor asks courts to weigh the amount of opposition to the settlement among class members. *Synfuel*, 463 F.3d at 653. "Significant opposition to a proposed settlement by interested parties should signal to a court that the settlement should not be approved." *Kolinek v. Walgreen Co.*, 311 F.R.D. 483, 495 (N.D. Ill. 2015). While the court must independently analyze all factors relevant to the settlement approval inquiry, the response from the class can provide insight into the fairness of both the settlement and the requested attorneys' fees and costs. *Hale*, 2018 WL 6606079, at *6. "Courts assess whether opposition levels are 'low' by comparing the number of objectors and opt-outs to the number of individuals reached by the notice plan." *Charvat*, 2019 WL 5576932, at *7.

    Here, per the declaration of Jason M. Stinehart, a program manager at Rust Consulting, the firm chosen by the parties to serve as the settlement administrator in this case, class notices were sent out to 456,948 class members between July 22 and September 9, 2019. As of November 13, 2019, 7,832 notices were returned to Rust as undeliverable. If the returned notice had a forwarding address, the notices were forwarded to that address. If no forwarding information was included, Rust submitted the addresses for research to a national address trace vendor and remailed them to any addresses that were capable of being updated. Class members could also write Rust or call the toll-free number and request the class notice be mailed to them via first class mail.

As of November 13, 2019, Rust had mailed out 3,390 class notices either as a result of address updates or upon request.

Thus, the court can estimate (456,948 - 7,832 + 3,390) that notice successfully reached 452,506 out of the 456,948 class members, a rate of approximately 99%. "The court previously approved the notice plan, and now, having carefully reviewed the declaration of the notice administrator, concludes that it was fully and properly executed, and reflected 'the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort.'" *Hale*, 2018 WL 6606079, at *6, quoting Fed.R.Civ.P. 23(c)(2)(B). Stinehart also declared that, on May 17, 2019, Rust sent CAFA notification to the office of the 56 state insurance regulators for all U.S. states and territories and the U.S. Attorney General, and the court finds that notice to be properly effectuated. See *Hale*, 2018 WL 6606079, at *6.

The deadline to object or opt-out of the settlement passed on November 4, 2019. Out of the 452,506 properly noticed class members, only five class members objected and only 209 class members requested to be excluded. Thus, only 0.001% of all settlement class members have objected, and more than 99.9% of notified class members decided to receive the benefits of the settlement. "This remarkably low level of opposition is 'strong circumstantial evidence in favor the settlement,'" especially considering that nearly half a million class members received individual, direct notice. See *Hale*, 2018 WL 6606079, at *6, citing *In re Mexico Money Transfer*, 164 F.Supp.2d 1002,

1021 (N.D. Ill. 2000) (the fact that more than 99.9% of class members have neither opted

out nor filed objections is strong circumstantial evidence in favor of the settlement);

*Charvat*, 2019 WL 5576932, at *7 ("Opt-out and objection rates below 0.01% suggest that

a settlement is reasonable."); *In re Southwest Airlines Voucher Litigation*, 2013 WL

4510197, at *7 (N.D. Ill. Aug. 26, 2013) (concluding that objections and opt-outs

amounting to less than 0.01% is a low level of opposition that supports the

reasonableness of the settlement).  Thus, the court finds this factor strongly supports

settlement approval.

     F.    <u>The Stage of Proceedings- The Seventh Circuit's Fifth Factor</u>

     The final *Synfuel* factor is the stage of proceedings and the amount of discovery

completed at the time of the settlement.  *Synfuel*, 463 F.3d at 653.  Courts should

consider the stage of proceedings and the amount of discovery completed in order to

determine how fully the district court and counsel are able to evaluate the merits of the

plaintiffs' claims.  *Charvat*, 2019 WL 5576932, at *8, citing *Armstrong v. Board of School

Directors of the City of Milwaukee*, 616 F.2d 305, 325 (7th Cir. 1980).

     Here, the parties have already engaged in some discovery related to the case.

Due to the early stage at which settlement negotiations commenced, the parties have

not engaged in substantial motion practice or discovery, but they have engaged in

substantial settlement-directed discovery.  See *Gehrich*, 316 F.R.D. at 230.  They have

conducted depositions related to issues in the settlement.  Class counsel has conducted

discovery relating to the implementation of the settlement and also participated in

Defendants' internal training of personnel responsible for implementing the settlement and independent testing plan.  "Although this settlement-directed discovery is not identical to the full merits discovery that would enable counsel to better 'evaluate the merits of plaintiffs' claims,' extensive formal discovery would entail substantial cost and might not have placed the parties in a materially better position than they are now to determine an appropriate settlement value."  *Gehrich*, 316 F.R.D. at 230 (citation omitted).  Thus, the court finds that the parties have completed a sufficient amount of discovery to be able to place value on their respective positions in this case, and that this factor favors approval.  See *Gehrich*, 316 F.R.D. at 230; *Charvat*, 5576932, at *8 ("Simply put, the parties have completed enough discovery to place a reasoned value on their respective positions and litigation risk.").

      G.      <u>Amicus Brief in Opposition from California Department of Insurance</u>

California raises three arguments in opposition to this court's final approval of the settlement: (1) the proposed settlement reflects intra-class member conflicts that call the agreement's fairness and adequacy into question; (2) the court does not have sufficient information to determine the fairness and adequacy of the settlement relief and the benefit provided to the settlement class; and (3) the release narrows the scope and effect of the California Department of Insurance's statutory authority to regulate the business of insurance transacted in California.

37

1.      **Whether the Proposed Settlement Reflects Intra-Class Conflicts That Call the Settlement's Fairness and Adequacy Into Question**

California argues that there are two types of class members: (1) policyholders who purchased a life insurance policy that was "issued by" (meaning purchased directly from) Defendant Accordia, and (2) policyholders whose life insurance policies were acquired by Accordia and were "converted to Defendant Alliance-One's administrative systems in August 2015 or January 2016."  California argues that, because the reference to "conversion" is only made with regard to the second group, the first group of class members was not subject to any conversion problems.  Further, none of the named Plaintiffs (Clapp, McGuire, McCleary, Jones) fall into the first group of class members in the class definition, because they all suffered Conversion-Related Issues, meaning that there is no class representative who represents the first group of members identified in the class definition, triggering concerns of intra-class conflicts. California is troubled by this because the settlement states the class members who do not have Conversion-Related Issues are not eligible for monetary relief under the claim review process, meaning an entire group of class members cannot get monetary relief.

The parties respond that there are no intra-class conflicts in that all settlement class members' claims, regardless of whether they arise from new business or converted policies, stem from common Conversion-Related Issues.  In addition, the parties note, all class members are entitled to injunctive relief, and the fact that only those members

who have suffered economic harm can recover monetary relief does not suggest any unfairness. The structure of the settlement means that the settlement fairly compensates each class member for the type of injury suffered and does not unfairly limit recovery of those who have suffered harm.

The court agrees with the parties. Merely because one type of class member did not receive the exact same type of relief as another class member, does not necessarily create an "intra-class conflict." As stated by the parties, the settlement affords relief to *all* class members, because all class members suffered Conversion-Related Issues. The distinction is that not all class members suffered the same kind of Conversion-Related Issues. Some suffered issues that only require injunctive relief (for example, class members who were unable to obtain policy information or had misreported policy values will receive updated policy information and corrected policy values), whereas others suffered more greatly from Conversion-Related Issues and require *both* injunctive and monetary relief (for example where a policy lapsed or incurred overdrafts due to incorrect premium withdrawals). The court would note that California did not argue that class members in the first group would actually be entitled to monetary relief, or identify any of those class members who were requesting monetary relief.

The court further finds the Seventh Circuit's decision in *Reynolds v. Beneficial National Bank*, 288 F.3d 277 (7th Cir. 2002), cited by California, to be distinguishable from the instant case. In *Reynolds*, recipients of income tax refund anticipation loans

brought a class action suit against a tax preparer and bank which made loans alleging

failure to disclose self-dealing, and other violations of consumer finance laws.  As part

of the settlement, the defendants agreed to create a fund of $25 million against which

members of the class could file a claim not to exceed $15. Any money left in the fund

after the expiration of the period for filing claims was to revert to the defendants, who

also agreed to injunctive relief in the form of certain required disclosures to future

customers.  The district judge approved the settlement except for the reversion and the

$15 cap, which at his insistence the parties raised to $30 for those members of the class

(apparently the vast majority) who had received two or more tax refund anticipation

loans from the tax preparer.

At the outset of its analysis, the Seventh Circuit noted that there was "an

unremarked conflict of interest within the class, between those class members who took

out one or two refund anticipation loans and those who took out more than two and

thus will receive no compensation for the additional damages that they incurred."

*Reynolds*, 288 F.3d at 282.  However, while "conflicts of interest can create serious

problems for class action settlements and require the creation of separately represented

subclasses[,]" because "of the modesty of the stakes even of class members who had

multiple refund anticipation loans and the expense of subdividing the class (and how

many subdivisions would be necessary to reflect the full range of damages?), [the court

was] not disposed to regard this particular defect in the settlement as fatal."  *Reynolds*,

288 F.3d at 282.

Unlike in *Reynolds*, where the court took issue with the adequacy of the relief for one group who suffered economic harm compared to the relief available another group who suffered economic harm, here *only one* group in the class suffered economic harm. For that group, monetary relief is available. For the other group, there is no allegation, in the filings in this case or in California's brief, that that group suffered economic harm and should be entitled to monetary relief. The court agrees with the parties that there is nothing unfair in not compensating with monetary relief class members who did not suffer economic harm. Indeed, were the settlement to do so, it may be unfair to those class members who did suffer economic harm.

The court would note that the *Reynolds* court did not even find such a settlement "defect" to be "fatal." See *Reynolds*, 288 F.3d at 282. That presumes that the distinction between the available relief in this settlement is a defect. However, as stated above, the mere difference in the type of relief offered between two groups within the class does not per se constitute a "conflict." Because each group has been afforded the relief to which it is entitled based on the harm they suffered, the court finds the settlement to be fair and adequate. To the extent an asymmetry arises between the relief earned by class members, that phenomenon would likely be the result of the different types of Conversion-Related Issues experienced by the class members, and would not be the result of a systemic flaw in the settlement itself. See *In re AT&T Mobility Wireless Data Services Sales*, 789 F.Supp.2d 935, 971 (N.D. Ill. 2011).

41

The court would further note that all class members, under the terms of the settlement, retain their contractual rights to benefits under their policies and do not waive those rights.

**2.      Whether the Court Has Sufficient Information to Determine theFairness and Adequacy of the Settlement Relief and the Benefit Provided to the Settlement Class**

California next argues that there does not appear to be any calculation from any source of the value of settlement relief.  Specifically, California argues that, because there is no information monetizing the value of the injunctive and monetary relief, there is no information on any identifiable fund from which claims (or other settlement-related costs such as class counsel's fees) will be paid, and there is no information to evaluate the claims rate and the total amount of monetary relief paid under the settlement, the court is left with insufficient information to assess the fairness and adequacy of the settlement relief.

a.  Injunctive Relief

California argues that the injunctive relief, as provided for in the settlement, is inadequate because it does not include disgorgement or restitution, there is no evidence of the injunctive relief's monetary value, some class members will not benefit from the injunctive relief, and it is unclear how long the injunctive relief will last.

The parties respond that the fact that different class members will receive different relief will not affect the adequacy of the settlement, the settlement's value is that nearly 500,000 people will obtain an injunction that requires Defendants to restore their policies in a way that resolves a wide range of Conversion-Related Issues, and that the injunctive relief has no end date.

The court agrees with the parties that California's concerns about the adequacy of the injunctive relief are misplaced.  Based on the court's reading of the settlement, the vast majority of class members will receive injunctive relief.  Those who suffered Conversion-Related Issues that can be remedied by injunctive relief will receive such relief.  As noted by the parties, the fact that some class members will receive different kinds or amounts of compensation under the settlement does not make the settlement "novel or unfair."  See *Uhl v. Thoroughbread Technology and Telecommunications, Inc.*, 309 F.3d 978, 986 (7th Cir. 2002).

 Simply because the parties have not attached a monetary value to the provided injunctive relief does not mean it is inadequate.  The injunctive relief effected by the settlement addresses the Conversion-Related Issues that can be corrected or remedied by such relief.  It is sensible that each class member will receive injunctive relief tailored to the type of Conversion-Related Issues they experienced, such as lapsed policies, lost benefits, etc.  The settlement requires that relief to be provided. The court finds the injunctive relief is valuable, adequate, and fair under the terms of the settlement. Finally, concerning how long the injunctive relief will last, and how long it will be

enforceable by class members, the parties state that the injunction has no end date, and will stand, and be enforceable by class members, until all class members' policies have been remedied and all class members' benefits are paid.  The court is satisfied that the injunctive relief is fair, reasonable, and adequate, and that it has enough information to make that determination.

b.  Monetary Relief

California argues that the court lacks information to determine the adequacy of the monetary relief, as not all class members are eligible for monetary relief, of those who are eligible only class members who have term-life policies can recover one of the four categories of monetary relief, there has been no expert valuation of the monetary relief to the class, there is no fund created to pay the claims, and the court lacks information needed to assess the settlement of class counsel's fees.

California also criticizes the claim review process, arguing that class members will be denied monetary relief unless they can produce evidence of a prior call to the customer service center in which they complained about Conversion-Related Issues. California also argues that the "confidential side agreement" in the settlement allowing Defendants to terminate the settlement if the opt-outs reach a certain threshold "suspicious."

The parties respond that the lack of a common fund does not diminish the far-reaching benefits of the settlement, California's concerns over the need for a prior call about Conversion-Related Issues and the concern about class counsel fees are misplaced.

California objects that the recovery some class members may get for their claims are below a certain level, but a settlement does not need to provide the class with the maximum possible damages in order to be reasonable. See *Charvat*, 2019 WL 5576932, at *6, citing *Douglas v. Western Union Co.*, 328 F.R.D. 204, 215 (N.D. Ill. 2018).

As with the injunctive relief, California's concerns about the monetary relief provided by the settlement are misplaced. Again, for the same reasons stated above in regard to injunctive relief and throughout this order, different class members, based on how they were affected by the Conversion-Related Issues, will be entitled to different kinds of relief, whether injunctive, monetary, or both, and within the monetary relief, entitled to different amounts of relief based on the harms suffered. What is important is that the class member is compensated or made whole or receives a remedy under the settlement.

The court finds no issue with a definite, set amount for the fund from which monetary relief will be paid. The fund is uncapped. There is a benefit to this, as noted by the parties, in that a common fund could have the effect of placing an artificial ceiling on money available to pay claims. The settlement requires Defendants to pay all valid claims, regardless of cost. There is no cap on what may be paid depending on the

individual claim.  The claim will go through a tiered claim review process, all the way up to an impartial retired federal judge.  Further, as it regards class counsel fees, the court finds those fees to be reasonable, as will be addressed below.  California's concern about a Confidential Side Agreement are unavailing, because, as the noted above, such provisions encourage settlement, the parties alerted the court to its presence so the court could consider it pursuant to Rule 23(e)(3), and the number of opt-outs is minuscule and Defendants have obviously not elected to terminate the settlement agreement. Thus, it is a moot point.

Finally, the court also rejects California's contention that the settlement's claim resolution requirement affects the adequacy and fairness of the monetary relief. The settlement requires that class members first call the customer contact center to try to resolve their claim over the phone before filing a written claim.  California argues that conditioning monetary relief upon proof of a prior customer service complaint renders a proposed class action settlement unfair, inadequate, and unreasonable.

In support, California cites to the district court's decision in *True v. American Honda Motor Corp.*, 749 F.Supp.2d 1052 (C.D. Cal. 2010).  In *True*, the purchaser of a "hybrid" motor vehicle filed lawsuit against vehicle's manufacturer on behalf of putative class of hybrid purchasers and lessees, alleging the class members were exposed to false and misleading advertisements regarding fuel economy of those hybrids and relied on those representations in paying a premium and purchasing hybrids during the five-year class period.

Under the settlement in *True*, a class member would be eligible for monetary relief only if the defendant had a written record which was "created in the ordinary course of business" of his or her complaint to the defendant or a Honda dealer. *True*, 749 F.Supp.2d at 1067-68. But whether the defendant retained a written record of a complaint, or whether a Honda dealer passed along a complaint to the defendant, was not within a class member's control, and, as noted by objector the State of Texas, this feature would thus "reward Honda to the extent that Honda failed to create or maintain records of consumer complaints." *True*, 749 F.Supp.2d at 1068.

The prior attempted resolution requirement in the instant settlement is much more reasonable than that at issue in *True*[4]. In *True*, a class member could only obtain monetary relief if they had complained to the defendant *before* there was a settlement and the defendant kept a record of the complaint "in the ordinary course of business." See *True*, 749 F.Supp.2d at 1067 ("This sub-group is defined as those who filed complaints with AHM [the defendant], those who filed complaints with a Honda dealer who then passed the complaint along to AHM, or those who complained to class counsel prior to March 2009. The members of this subgroup are the only class members

---

[4] The court would also note another distinction from *True* is that 26 states filed amicus briefs urging the court to reject the settlement as unfair, and the State of Texas, itself an actual class member, filed an official objection. *True*, 749 F.Supp.2d at 1082. Here, by contrast, only one state, California, has filed an amicus brief urging the court to reject the settlement.

47

who will receive a true cash award in this settlement. Plaintiffs contend that an extra award for members of this sub-group is appropriate, as these class members were "aggrieved enough to have taken steps towards litigation in complaining to AHM.").

Here, by contrast, every class member has 18 months from the date of the last Class Notice Mailing to try to obtain their relief from a phone call rather than submission of a formal written claim.  Section V-C of the settlement states that, "[i]n order to be eligible for Claim Review Relief, a Settlement Class Member must have previously attempted to resolve a Conversion-Related Issue with Defendants."  Then, Section VI.B.1 states that, in order to receive any "Claim Review Relief, a Claimant must complete and submit a Claim Form by the Claim Filing Deadline."  The Claim Filing Deadline is the last day of the Class Period, which is defined as "the timeframe to submit claims, which shall run for 18 months following the date of the last Class Notice Mailing, as described in the Class Notice Schedule."  The Class Notice will inform the class member recipient of the Claim Filing Deadline.  Thus, class members will have 18 months, at least, from their receipt of the Class Notice, to call the call center and attempt to quickly resolve their Conversion-Related Issue over the phone.  The date is provided to them in the Class Notice, and fully explained to them.  The Class Notice Mailing period ended September 20, 2019, meaning class members seeking to avail themselves of the claim review relief process must file their claim forms no later than March 4, 2021. That is more than nine months from the date the court is entering final approval of the settlement, in contrast to the situation in *True* where class members had to complain

48

*before* the parties even moved for preliminary approval of the settlement. The circumstances whereby class members need to place a phone call to be eligible for monetary relief via the claims review process is eminently more fair than the circumstances presented to the court in *True.*

The Claim Form also instructs the class member to call the customer contact center before filing the claim, unlike the situation in *True*. California frames this as problematic, because the phone call will be made after the settlement has been reached, calling "into question the purpose of having a condition like this in the first place." The court views this differently. If anything, the parties are making it clear to the class member, in bold font on the claim form itself, what the class member needs to do before filing a claim. The phone call is a more informal process that could resolve the class member's claim in a less time-consuming and more efficient manner. If the phone call does not the resolve the issue, they can proceed with the claim review process as outlined in the settlement and Class Notice. This is substantially different from the *True* situation where a subclass of plaintiffs received an "extra award" for aggressively and officially registering their claims with the defendant before the parties settled and moved the court for preliminary approval.

Finally, it should be acknowledged that, according to Accordia's vice president for the customer experience Amanda Harless, Accordia has not denied any claim for failing to call the customer call center first.

49

The court also finds the claim forms to be reasonable.  California argues that the claim form in particular is "complicated" with "numerous fill-in-the-blank sections that directs the submission of supporting documentation[.]" California believes that this will lead to low claim submission rate.  The court, however, in reviewing the forms attached as Exhibit B and B-1 to the parties' "Stipulation of Settlement" (document #43-1 on the court's docket, filed May 10, 2019), finds them to be clear and easy to follow.  If they are long, it is because the forms are exhaustive in presenting the range of claims and relief available to the class members, along with the processes at work in the case.  The court finds California's arguments unpersuasive on these issues.

### 3. Whether the Settlement Impinges Upon California's Regulatory Authority

California next argues that the "released claims" provision of the settlement appears to narrow the scope and effect of California's authority to regulate insurance business transacted in California.  California argues that the provision "include[s] a release of claims in  'regulatory or administrative proceedings," which California believes precludes California settlement class members from submitting complaints to the Department of Insurance, thereby hampering its ability to pursue enforcement actions for violations of the state's insurance code and related regulations.

The parties respond that the release specifically carves out from the release all regulatory actions already in progress, including California's ongoing enforcement action and the impending settlement.  The parties argue that the release provision does prevent class members from achieving a double recovery by accepting the benefits of the settlement and then obtaining those same benefits a second time through regulatory

actions, but it in no way prohibits California from bringing additional regulatory

actions seeking additional remediation work or the levying of fines.  The parties argue

that, without this narrow exclusion, Defendants' release would be rendered largely

meaningless.

Section X.A.3 of the settlement releases all claims against Defendants that were,

could reasonably have been, or in the future might be reasonably asserted by Plaintiffs,

class members, or by the released parties "that could have been brought in any other

court or forum, including but not limited to... regulatory or administrative

proceedings..."  The provision goes on to state "For avoidance of doubt, state and

federal government officials or agencies shall retain all regulatory enforcement powers,

but Settlement Class Members are releasing any and all claims based on Conversion-

Related Issues, including claims for restitutionary and other monetary relief, by

participating in this Settlement, other than claims that may be submitted through the

Claim Review Process."

California argues that, although the provision contains language stating that

"state and federal government officials or agencies shall retain all regulatory

enforcement powers," the latter part of that sentence stating that class members "are

releasing any and all claims based on Conversion-Related Issues, including claims for

restitutionary and other monetary relief" effectively neuters the earlier portion

preserving regulatory power and circles back to the beginning of § X.A.3 releasing

claims class members could have brought in regulatory or administrative proceedings.

The parties, of course, hold that the provision merely prevents class members from having their cake and eating it too by accepting the benefits of the settlement and then turning around and accepting the benefits of California's regulatory action.

"A settlement offer is a compromise and may include a release of claims not before the court." *Kaufman v. American Express Travel Related Services Company, Inc.*, 877 F.3d 276, 287 (7th Cir. 2017). "It is not at all uncommon for settlements to include a global release of all claims past, present, and future, that the parties might have brought against each other." *Williams v. General Electric Capital Auto Lease, Inc.*, 159 F.3d 266, 274 (7th Cir. 1998).

Examining the release at issue here, there is nothing unusual or unfair about Defendants' interest in finality and their desire to be released from the class members' claims, particularly after providing the class with broad injunctive relief and uncapped monetary relief depending on the type and amount of harm suffered due to Conversion-Related Issues. See *Mangone v. First USA Bank*, 206 F.R.D. 222, 231 (S.D. Ill. 2001). The release does nothing to stop regulatory agencies such as the California Department of Insurance from pursuing regulatory action against Defendants in this matter. The release specifically states that state and federal agencies "shall" retain all regulatory and enforcement powers. The release does not affect California's ongoing regulatory action.

Also, as the court reads § X.A.3, nothing in the release states that class members cannot aid or participate in such regulatory action, just that they cannot *benefit* from such an action so as to effect for themselves a double-recovery on their Conversion-Related Issues.

The release binds the class members from pursuing any further actions based on these claims, whether in civil court or regulatory proceedings, when they have already obtained relief via the class settlement. Such releases have been upheld in court. See *In re: Sears, Roebuck and Co. Front-loading Washer Products Liability Litigation*, 2016 WL 772785, at *14 (N.D. Ill. Feb. 29, 2016) (approving settlement that contains provision stating "the Releasing Parties release, forever discharge, and covenant not to sue the Released Parties from and for Claims as set forth in the Settlement Agreement. The Releasing Parties are permanently enjoined and barred from instituting, commencing, or prosecuting any action or other proceeding asserting any Released Claims released in the Settlement Agreement against any of the Released Parties, *either indirectly, individually, representatively, derivatively, or in any other capacity, by whatever means, in any local, state, or federal court, or in any agency or other authority or arbitral or other forum wherever located*.") (emphasis added); see also *O'Connor v. Uber Technologies, Inc.*, 2019 WL 4394401, at *10 (C.D. Cal. Sept. 13, 2019) (granting final approval to settlement containing provision stating "The Settlement Agreement and this Order permanently bar and enjoin the Named Plaintiffs, and all other Settlement Class Members who have not been excluded from the Settlement Class as provided in the Opt-Out List approved by the Court, from (i) filing, commencing, prosecuting, intervening in, or participating

53

(as class members or otherwise) *in any other lawsuit or administrative, regulatory, arbitration, or other proceeding in any jurisdiction based on the Named Plaintiffs' General Released Claims (in the case of the Named Plaintiffs), the Settlement Class Members' Released Claims (in the case of the Settlement Class Members)*, and Authorized Claimants' Released Claims (in the case of the Authorized Claimants) and (ii) organizing Settlement Class Members or Authorized Claimants into a separate group, class, or subclass for purposes of pursuing as a purported class action *any lawsuit or administrative, regulatory, arbitration, or other proceeding* (including by seeking to amend a pending complaint to include class allegations, or seeking class certification in a pending action) based on the Settlement Class Members' Released Claims or Authorized Claimants' Released Claims.") (emphasis added).

California also states that is "concerned" that the release frees Athene, Inc., from liability, even though Athene was never a named party and is not an Accordia affiliate. The parties explain that Athene needed to be included in the release because they were the company on whose paper many of the policies remain, and any release that did not include Athene, the company on whose paper many of the policies remain, would also subject Accordia to duplicative lawsuits as the indemnitor of Athene. The court agrees with the parties and does not find Athene's inclusion in the release to be a cause for concern.

California further raises concern that the release states that named Plaintiffs and the settlement class reserve the right to sue persons or entities other than the released parties, and that named Plaintiff and class members must "reduce the amount of claims

54

against that other party by the proportionate share of liability of the 'Released Parties.'" California does not explain, however, why or how this is problematic.  How would class members be harmed by such a provision?  All it means is that they would not obtain a double recovery or windfall from Defendants or "the persons or entities other than the released parties."  Class members would still be receiving the full recovery amount they were due.

Based on the above, the court does not find California's arguments against final approval of the settlement persuasive.

H.   <u>Objectors</u>

The court entered its Order (#44) granting preliminary approval of the settlement on June 7, 2019.  The court then received Objections from James Dempsey (#46), Marc Conley (#49), John P. Counts (#52), Rodney Stanley (#53), and Mary Drahn (#64). "When there are objecting class members, the judge's task is eased because he or she has the benefit of an adversary process: objectors versus settlors (that is, versus class counsel and the defendant)."  *Redman*, 768 F.3d at 629.

1.   **James Dempsey**

James Dempsey's objection contains no argument against the settlement, and it is not entirely clear what he is objecting to.  Mr. Dempsey's letter appears to state that the settlement does not affect his policy "at this time."  He claims he called on August 29, 2019, that he has not had a claim to "collect" money from Defendants, and was told that their "policies" are still in force to be "used" when we <u>"need them!"</u>

Mr. Dempsey does not state what kind of policy he had, what kind, if any, of Conversion-Related Issues he experienced, and what specific portion of the settlement he takes issue with.  Mr. Dempsey's objection is overruled.

**2.      Marc Conley**

Marc Conley's objection concerns the $2.2 million class counsel fee request. Conley argues that the attorneys should not be compensated for steps a policy holder should have taken.

"Awarding the attorneys with such a large number is doing more damage to the policy holders by weakening the company.  A more equitable outcome would be to place any monetary penalty on the Parent company and its Directors.  That might get their attention and make them more vigilant."

Conley does not state what kind of "penalty" he has in mind for Accordia and its directors, and whether the court would have the authority to impose such a penalty.  It is also doubtful that Defendants would consent to a civil settlement where, instead of attorney's fees, Defendants and their directors would be severely penalized in some manner, whether monetarily or legally.

A settlement is a compromise, and here Plaintiffs are attempting to achieve the best possible relief for the class, weighed against the risks of trial or summary judgment.  See *Kolinek*, 311 F.R.D. at 494-95 ("a settlement is a compromise, and courts need not—and indeed should not—reject a settlement solely because it does not provide a complete victory to plaintiffs.") (internal citation omitted).

56

To the extent Conley objects to the amount of class counsel attorneys' fees, the court will address that below.  Otherwise, this objection is overruled.

**3.      John P. Counts**

John Counts objects because the monetary relief offered via the claims review process "is not certain enough and does not go far enough."  Counts argues that the class members going through the claim review process should only have to make a prima facie case for their requested relief, then the burden of denying the relief should fall on Defendants.  Counts then states that all class members should receive a cash award of $5,000, equal to that of the named Plaintiffs, since all class members suffered from the same Conversion-Related Issues.  In the alternative, in a more targeted approach, Counts asks that class members who could meet one or more conditions (made two or more phone calls to Defendants about their policy, made one or more payments on the policy despite all the confusion surrounding the Conversion-Related Issues, or actually wrote to Defendants about the policy and Conversion-Related Issues) should be given the $5,000 lump sum payment.  Finally, Counts asks the court to consider the Defendants' alleged bad actions and the damage caused to class members' emotional health and financial well-being.

First, the court is sympathetic to the stress, anxiety, confusion, and financial dislocation caused by the Conversion-Related Issues to objector Counts and all of the class members.  Having insurance should be a source of comfort and reassurance against the unpredictability and catastrophic events that can occur in life.  The issues around the botched conversion process, and the resulting harms to the class members

from that process, gave rise to the litigation in this case. The court does not take lightly the allegations in this case concerning Defendants' actions and the damages suffered by the class.

However, the court must make decisions based on the properly admitted evidence before it. For those reasons, as articulated throughout this Order, the court finds the settlement to be fair, adequate, and reasonable. Examining the claims review process, the court finds it to be thorough and fair. If class members who utilize the process are not satisfied, they can pursue their claim all the way up to a neutral third party, a retired federal judge, beholden to no party in this case. The court, as also explained above, finds the monetary relief offered in this case to be fair and adequate, tailored to the harms suffered by the individual class members. Counts' request of lump sum payments to all class members would total north of $2 billion. The settlement and monetary relief offered in the settlement are not perfect, and not everything every class member wants or asks for can be had, but a settlement is a compromise, and, again, the court believes Plaintiffs have attempted to achieve the best possible relief for the class when weighed against the risks of trial or summary judgment. See *Kolinek*, 311 F.R.D. at 494-95.

Further, as it concerns the $5,000 lump sum awarded to the named Plaintiffs, those Plaintiffs came to class counsel with the case, worked with counsel to understand what happened with the Conversion-Related Issues, and without those named Plaintiffs there may not have been a lawsuit (at least, the instant suit) and half a million class

members may not be getting relief.  The court finds the award for the named Plaintiffs to be reasonable based on their participation in the case and the statements of class counsel at the December 2, 2019, final approval hearing. The objection is overruled.

### 4.      Rodney Stanley

Rodney Stanley's objection concerns the issues he had with Conversion-Related Issues.  Stanley's objection appears to be a general objection to Defendants' actions and negligence that led to the lawsuit in the first place, in that Defendants tried to withdraw $10,000 from his checking account to pay premiums.  He states if he would have known this was how the litigation would have ended, "by [Defendants] negligence then" he would have taken his cash value and cancelled his policies "way back when it started." He does not suggest what he believes to be inadequate about the settlement.  The court surmises that he believes Defendants' have not given up enough in the settlement, or that he believes larger monetary relief should be awarded.  However, as noted, settlement is a compromise and courts should not reject a settlement solely because it does not provide a complete victory to the plaintiffs. See *Kolinek*, 311 F.R.D. at 494-95. Stanley's objection is overruled.

### 5.      Mary Drahn

Drahn's objection simply states "object to settlement" and that, due to health issues she had, it put her "in a bind" when she "owed so much back payment."  No other argument against the settlement is made.  Drahn's objection is overruled.

I.      Conclusion

Based on its evaluation of all the factors under Rule 23(e)(2) and the Seventh

Circuit's case law, the court finds that the settlement is fair, adequate, and reasonable.

II.     ATTORNEYS' FEES AND INCENTIVE AWARD

Plaintiffs have moved the court to award attorney's fees in the amount of $2.2

million, and for incentive fees to named Plaintiffs for their service in the sum of $5,000

each.  Defendants do not oppose this motion.  As noted above, one of the objectors, John

P. Counts, appears to object to both the attorney's fees and named Plaintiffs' incentive

award, although the incentive objection might be that every class member did not

receive a $5,000 lump sum payment.

*Incentive Award*

Plaintiffs seek a $5,000 service/incentive award for the named Plaintiffs as class

representatives.  This award is to be paid by Defendants in addition to the settlement

benefits and does not diminish the settlement benefits, and Defendants do not oppose

payments of these amounts.  Plaintiffs argue that the service award is fair and

reasonable in light of named Plaintiffs contributions to pursuing the claims in the

litigation, working with class counsel, and obtaining the settlement benefits on behalf of

the class members.

"Incentive awards are justified when necessary to induce individuals to become

named representatives."  *In re Synthroid Marketing Litigation*, 264 F.3d 712, 722 (7th Cir.

2001).  "In deciding whether an incentive award is proper and, if so, in what amount,

'relevant factors include the actions the plaintiff has taken to protect the interests of the

class, the degree to which the class has benefitted from those actions, and the amount of time and effort the plaintiff expended in pursuing the litigation.'" *Gehrich*, 316 F.R.D. at 239, quoting *Cook v. Niedert*, 142 F.3d 1004, 1016 (7th Cir. 1998).

Plaintiffs attached to the motion as Exhibit C the declaration of class counsel Richard E. Shevitz.  In the declaration Shevitz states that negotiations on incentive awards were negotiated at arms' length in a mediation presided over by Professor Eric Green.  Shevitz declares that the four named Plaintiffs actively participated in the litigation and assisted class counsel by helping develop claims in the litigation, providing factual information and documents, participating in crafting a settlement structure that remedies the problems raised in their lawsuit and by protecting the interests of the class.

This case, apparently, did not proceed past the earliest stages of litigation before settlement negotiations began following an in-person mediation with Professor Green on December 1, 2017, in a separate but related matter that was then pending in the Central District of California (that case was later dismissed once the class action in this court settled).  Still, named Plaintiffs attached their name to this litigation, actively participated in it, and assisted class counsel in a myriad of ways to enable a reasonable settlement that inures to the benefit of the class as a whole.  See *Gehrich*, 316 F.R.D. at 239.  Further, no claim or evidence has been put forward that any of the named Plaintiffs has any conflict of interest with Defendants or class counsel of the sort that the Seventh Circuit has found problematic in determining the appropriateness of an

incentive award.  See *Gehrich*, 316 F.R.D. at 239, citing *Eubank*, 753 F.3d at 723-24.

Finally, based on the level of participation and the size and scope of the relief achieved

by the settlement, the court finds the $5,000 amount to be reasonable and in-line with,

and even far below, the class representative award amount in other class action

settlements.  See *Gehrich*, 316 F.R.D. at 239; *Kolinek*, 311 F.R.D. at 502-03 ($5,000 awarded

to class representatives); *In re Capital One*, 80 F.Supp.3d at 809 ($5,000 awarded to class

representatives); *Charvat*, 2019 WL 5576932, at *10 ($50,000 awarded to class

representative who extensively participated in discovery process and underwent seven

hour deposition); *Hale*, 2018 WL 6606079, at *15 ($25,000 awarded to class

representatives).  The court, therefore, grants Plaintiffs' motion for the incentive awards.

   *Class Counsels' Attorneys' Fees*

   Plaintiffs argue that the court should approve the $2.2 million in sought after

attorneys' fees because the fees are supported by a blended hourly rate of $495 an hour

and 2,261.4 hours of professional time, which computes to a multiplier of less than 1.97,

"well within the range approved by courts in the Seventh Circuit" and because the fees

compensate class counsel "for the significant time, effort, risk, and expense employed in

the successful resolution of this action."  Plaintiffs further argue that the requested fees

are fair and reasonable when measured by class counsel's lodestar, and notes that the

negotiations between the parties that resulted in the agreement on attorneys' fees was

conducted under the supervision of Professor Eric Green, the mediator who had

worked with the parties to negotiate the settlement terms and who was familiar with

the benefits of the settlement and class counsel's efforts in reaching the settlement.

A.   Proper Method for Calculating Fees

Federal Rule of Civil Procedure 23(h) allows a district court, in a certified class

action, to "award reasonable attorney's fees and nontaxable costs that are authorized by

law or by the parties' agreement."  Fed.R.Civ.P. 23(h).  Attorneys' fees in class actions

should approximate the market rate that prevails between willing buyers and willing

sellers of legal services.  *Silverman v. Motorola Solutions, Inc.*, 739 F.3d 956, 957 (7th Cir.

2013).  "As part of this inquiry, 'the judge must assess the value of the settlement to the

class and the reasonableness of the agreed-upon attorneys' fees for class counsel,

bearing in mind that the higher the fees the less compensation will be received by the

class members[,]'" and that "'[t]he central consideration is what class counsel achieved

for the members of the class rather than how much effort class counsel invested in the

litigation.'" *Douglas v. Western Union Co.*, 328 F.R.D. 204, 219 (N.D. Ill. 2018), quoting

*Redman*, 768 F.3d at 629, 633.

The two methods used to calculate attorneys' fees in a class action setting are the

percentage method and the lodestar method, and the district court has discretion in

determining which method to apply.  *American Art China Co., Inc. v. Foxfire Printing and

Packaging, Inc.*, 743 F.3d 243, 247 (7th Cir. 2014).  It is legally correct for a district court to

choose either method, and "[d]oing so is obviously not an abuse of discretion."

*American Art China*, 743 F.3d at 247.  Either the lodestar or percentage method may be

appropriate in determining attorneys' fee awards, depending on the circumstances.

*Florin v. Nationsbank of Georgia, N.A.*, 34 F.3d 560, 566 (7th Cir. 1994).  The court agrees

63

with the parties that, because the settlement in this case involves injunctive relief and a claims process to award uncapped money damages, and no set "common fund" exists, the lodestar method is the better approach to determine appropriateness of the attorneys' fees.

Where the parties are in agreement as to which attorneys' fees calculation method to apply, the court may defer to the parties' agreement. See *Reid v. Unilever United States, Inc.*, 2015 WL 3653318, at *6 (N.D. Ill. June 10, 2015).

> To calculate an appropriate fee award, courts start with the "lodestar" amount, determined by "multiplying a reasonable hourly rate by the number of hours reasonably expended on the litigation." *Small v. Richard Wolf Med. Instruments Corp.*, 264 F.3d 702, 707 (7th Cir. 2001); see also *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983). Under this approach, the party seeking fees bears the burden of proving the reasonableness of the hours worked and rates claimed. *Hensley*, 461 U.S. at 437. A good faith effort must be made to exclude excessive, redundant, or unnecessary hours. *Id.* at 434. The court, for its part, must exclude hours it deems inadequately documented or not reasonably expended on the litigation. *Id.* at 433–34; *Spegon v. Catholic Bishop of Chi.*, 175 F.3d 544, 550 (7th Cir. 1999). There is a "strong presumption" that the lodestar method yields a reasonable fee. *Perdue v. Kenny A. ex rel. Winn*, 559 U.S. 542, 554 (2010); see also *Pickett v. Sheridan Health Care Ctr.*, 664 F.3d 632, 639 (7th Cir. 2011).

*Reid*, 2015 WL 3653318, at *3.

"The best evidence of the market rate is the amount the attorney actually bills for similar work, but if that rate can't be determined, then the district court may rely on evidence of rates charged by similarly experienced attorneys in the community and evidence of rates set for the attorney in similar cases." *Montanez v. Simon*, 755 F.3d 547,

553 (7th Cir. 2014); *Norton v. City of Springfield*, 281 F.Supp.3d 743, 747 (C.D. Ill. 2017). The prevailing party has the burden of establishing the market rate for the work; if the attorneys fail to meet that burden, the district court can independently determine the appropriate rate.  *Montanez*, 755 F.3d at 553.

Class counsel William Shevitz, in his declaration, declares that class counsel undertook representation of Plaintiffs on a purely contingent basis.  Because contingent-fee-earning attorneys do not possess the hourly billing rate needed to compute the lodestar, both the Supreme Court and the Seventh Circuit have instructed courts to rely on the hourly rates that attorneys of comparable skill, experience, and reputation charge for similar work.  *Pickett*, 664 F.3d at 641, citing *Blum*, 465 U.S. at 894.

Because class counsel took this case on a contingency basis, the court must award class counsel a multiplier.  See *Cook*, 142 F.3d at 1013 ("Our cases hold that the district court must award a multiplier when attorney's fees are contingent upon the outcome of the case (i.e., there is the possibility that the attorney will not receive any fee).").  The choice of a particular multiplier is a matter of discretion, requiring a retroactive calculation of the probability of success as measured at the beginning of the litigation. *In re Southwest Airlines Voucher Litigation*, 2013 WL 5497275, at *12 (N.D. Ill. Oct. 3, 2013). The overall standard is whether the fees are reasonable in relation to the difficulty, stakes, and outcome of the case.  *Southwest Airlines*, 2013 WL 5497275, at *12, citing *Connolly v. National School Bus Services, Inc.*, 177 F.3d 593, 597 (7th Cir. 1999).

B.    <u>Analysis of the Requested Fees</u>

In this matter, class counsel submitted a "blended" hourly rate of $495 for each of the class counsel attorneys.  A "blended" rate is a weighted average of the rates for senior and junior attorneys in a case.  *Youakim v. McDonald*, 171 F.R.D. 224, 230 (N.D. Ill. 1997).  Blended rates can be submitted by class counsel for comparison with current market rates for similar legal services.  See *In re National Collegiate Athletic Association Student-Athlete Concussion Injury Litigation*, 332 F.R.D. 202, 222 n.19 (N.D. Ill. 2019); *Nolte v. Cigna Corp.*, 2013 WL 12242015, at *3 (C.D. Ill. Oct. 15, 2013) (noting that a blended rate of $514.60 would be reasonable and consistent with market rates and noting that courts in the Northern District of Illinois, Southern District of Illinois, and Central District of Illinois have all approved Class Counsel's hourly rate in similar litigation).

The court must now compare the $495 hourly rate to that which attorneys of comparable skill, experience, and reputation charge for similar work.  See *Pickett*, 664 F.3d at 641.  In support of their motion, class counsel attached the affidavit of William J. Brinkmann, an attorney with the Champaign, Illinois law firm of Thomas Mamer LLP. Brinkmann has more than 45 years experience as an attorney, having extensive experience as a civil litigator, primarily on the side of defendants, in the state and federal courts, including the Central District of Illinois.  Brinkmann is familiar with the customary and usual hourly rates charged by attorneys in the Champaign-Urbana area for services in complex civil litigation.[5]

---

[5] The court is familiar with Mr. Brinkmann and finds that he is more than experienced in the matters.

Based on his experience and practice, the usual and customary hourly rates charged by attorneys with fifteen or more years of experience in complex litigation in the Champaign-Urbana area is from $300 to $600 per hour.

The experience and background of class counsel in this case indicates that the $495 rate, though on the higher end of the $300 to $600 range for attorneys with fifteen years or more experience attested to by attorney Brinkmann, is appropriate. First, all of the attorneys save Mr. Miller have more than fifteen years experience. Miller, the least experienced, has thirteen years experience. However, based on the document attached as Exhibit 1 to class counsel Shevitz's declaration, Miller's firm, Cohen & Malad, LLP, has an extensive practice in complex cases covering all kinds of class action litigation, from antitrust to consumer fraud to securities fraud. Miller has experience in all of those areas of class action litigation. Class counsel Shevitz, a partner at Cohen & Malad, has 34 years of experience and serves as chair of the firm's class action practice group, and has focused his practice on all kinds of class action litigation since joining the firm in 1995. Class counsel Terrell and Yancey both work for Methvin, Terrell, Yancey, Stephens, & Miller, another firm with an emphasis on complex class action litigation. Yancey has nineteen years experience, while Terrell has practiced law for 21 years. Finally, class counsel Williams has 45 years experience, putting him well on the high end of the $300 to $600 reasonable rate range.

The court finds, taking into account the many years of experience of class counsel working in complex civil litigation, including specialists in class action litigation, that $495 is a reasonable blended rate for counsel of this substantial experience engaged in complex civil litigation of a national scope in the Central District of Illinois.  See *Nolte*, 2013 WL 12242015, at *3 ("The Court finds that the market for legal services in cases such as this is a national one, and that a Class Counsel's proposed blended rate of $514.60, approved in 2009, is reasonable and consistent with market rates at that time and could be enhanced to today's rates."); *Will v. General Dynamics Corp.*, 2010 WL 4818174, at *3 (S.D. Ill. Nov. 22, 2010) ("This is national litigation which few lawyers or law firms are capable of handling. Applying a reasonable blended rate for attorney time of $514.60 per hour, including $800 per hour for hours spent by senior partners, rates found reasonable for Class Counsel in other recent cases[.]"); *Hale*, 2018 WL 6606079, at *14 (approving blended average of $527.34 as reasonable based on the complexity of this case and participation of highly-experienced lawyers with national practices and expertise).

Next, the court examines the hours worked by class counsel.  Class counsel submits that a total of 2,261.4 hours has been worked by counsel in this case, broken down between the three participating law firms as follows: Williams Law Firm - 575.8 hours; Cohen & Malad - 747.8 hours; and Methvin, Terrell, Yancey, Stephens & Miller - 937.8 hours.

The court finds that such hours are reasonable based on the enormous task of investigating this case, negotiating the settlement, crafting and then implementing the settlement relief and settlement procedures.  The court would note that, per the parties, the number of hours submitted does not include additional time that will be expended in the 18-month claim period.  Further, no objector has offered any challenge to the reasonableness of the time claimed by counsel, and, on the face of the fee petition, the hours claimed by counsel do not appear to be excessive, thus the court has no point of reference from which it can fairly challenge counsels' claim that the time they spent on the case was reasonable.   See *Southwest Airlines*, 2013 WL 5497275, at *8.

Counsel also claims that the $88,927.62 in costs and expenses are not part of the total award of attorneys' fees, even though requests for such reimbursement are often honored in class action cases.  See *Nolte*, 2013 WL 12242015, at *4.  Here, class counsel has agreed to absorb those expenses.

The court also finds the requested 1.97 multiplier to be reasonable. Here, class counsel have requested a multiplier of 1.97, and thus the court need not worry about exceeding what the Seventh Circuit has suggested is a sensible ceiling of double the lodestar.  See *Florin*, 34 F.3d a 565; *Cook*, 142 F.3d at 1013 ("We also have speculated that a multiplier of 2 may be a sensible ceiling."); see also *Harman v. Lyphomed, Inc.*, 945 F.2d 969, 975 (7th Cir. 1991) ("Multipliers anywhere between one and four have been approved.") (citation omitted).  Success, or degree of success in this case, was not certain at the point litigation was initiated, and Defendants have indicated that they

believed they had viable defenses to at least some of Plaintiffs' claims.  Class counsel took the risk of expending significant resources and time on this litigation with no guarantee of clear, substantial success.  Further, this case was complex and nationwide in scope.  Thus, the court concludes that the hours worked, rates billed, and resulting multiplier are all customary and reasonable for cases of this complexity.  See *Hale*, 2018 WL 6606079, at *13.

The court finds that the $2.2 million in attorneys' fees figure arrived at by the parties, and approved by mediator Professor Green, are reasonable and fairly arrived at.

The court must also  separately consider whether the requested $2.2 million is fair and reasonable when considered against what the class received from the settlement.  See *Southwest Airlines*, 2013 WL 5497275, at *10-11 (having determined the reasonableness of the lodestar request, the court may adjust the lodestar based on certain factors, the most key of which, that is not subsumed in the hourly, rate, and multiplier analysis, is the degree of success obtained, *i.e.* the actual value of what counsel obtained for the class).  In deciding whether to approve requested attorneys' fees in a class action, the judge must assess the value of the settlement to the class and the reasonableness of the agreed-upon attorneys' fees for class counsel, bearing in mind that the higher the fees the less compensation will be received by the class members. *Redman*, 768 F.3d at 629. "Analysis is more complex when the principal benefits of the settlement are nonmonetary, as when equitable relief is awarded rather than damages. A value must be attached to the relief obtained by the class as part of the determination

70

of an appropriate attorneys' fee for class counsel, but a rough estimate may be permissible, especially when, as in civil rights cases, much of the value of the equitable relief may be nonmonetizable." *Redman*, 768 F.3d at 635.

What value the settlement has to the class is not, at the outset, readily apparent. This is a unique class action case and class action settlement. A good portion of the relief is injunctive, and the monetary relief afforded may vary from class member to class member, depending on their individual claim. Further, the "fund" from which monetary relief will be drawn is uncapped.

Again, the value of the settlement to each class member will vary widely. Some class members will only receive injunctive relief, such as automatic correction of non-forfeiture status, automatic back-dating of fixed premium payments so that policyholders receive retroactive fixed interest on their policies, a 24-month period to repay missed premium payments if requested by the policyholder. What is that relief worth? Peace of mind, $5, $10, or $20? For monetary relief, for example, class members may receive refunds of bank overdraft charges. How much that is depends on each bank's policies, a reasonable estimate may be $35 to $50 per overdraft. However, even placing a "rough" estimate on valuation of $15 per eligible class member, which may be on the low end, the total value of the settlement to the 452,506 eligible class members would be roughly $6.78 million.

The $2.2 million requested attorneys' fees would be just under one-third of the settlement's value to the class, under the portion of the settlement value the Seventh Circuit said fees should not exceed. See *Pearson*, 772 F.3d at 782 ("the presumption should we suggest be that attorneys' fees awarded to class counsel should not exceed a third or at most a half of the total amount of money going to class members and their counsel."); *Douglas v. Western Union Co.*, 328 F.R.D. 204, 219-20 (N.D. Ill. 2018). A 32% attorneys' fee award reflects the market rate and takes into account the risk of non-payment, and should be granted. See *Charvat*, 2019 WL 5576932, at *12.

Importantly, any attorneys' fees awarded will not diminish whatever monetary relief may be had by class members entitled to same. Thus, a higher fee will not result in less compensation received by class members. See *Redman*, 768 F.3d at 629.

"The central consideration is what class counsel achieved for the members of the class rather than how much effort class counsel invested in the litigation." *Redman*, 768 F.3d at 633. The court, having examined the settlement, finds that class counsel achieved quite a bit for the members of the class. The injunctive relief restores policies to the proper status in which they existed before the Conversion-Related Issues, and the claims process and monetary relief attempt to rectify the overdraft and payment issues experienced by class members due to the bungled conversion process.

The court will repeat that the settlement is not perfect, and likely does not fully address the stress and anxiety suffered by certain individual class members due to Conversion-Related Issues, but the court is mindful that the number of objections is

extraordinarily low when compared to the total amount of class members.  If a significant number of class members experienced severe fiscal or emotional distress due to Conversion-Related Issues, thus rendering the relief obtained in the settlement insufficient, it did not show up in the amount of objections or opt-outs to the settlement.

To the general criticism against the fee request expressed by the objector Counts, the court would point out the novelty of the settlement obtained by class counsel and the great risk of nonpayment by such an undertaking, including the assumed responsibility to pay the opposing party's allowable costs if unsuccessful.  See *Martin v. Caterpillar*, 2010 WL 11614985, at *4 (S.D. Ill. Sept. 10, 2010).

There is an aspect of the attorneys' fees issue that gives the court pause.  Section XI.A of the settlement agreement states that "Plaintiffs' Counsel will make, and defendants agree not to oppose, an application for the award of attorneys' fees and costs in the aggregate amount of" $2.2 million, "subject to Plaintiffs' counsel providing information to the mediator, Professor Eric Green of Resolutions, LLC, in a form acceptable to him, demonstrating to Professor Green's satisfaction a lodestar amount of at least" $1.1 million "in fees and costs" (which would be the amount before application of the multiplier).

Such a clause is known as a "clear-sailing clause"—a clause in which the defendant agrees not to contest class counsel's request for attorneys' fees.  *Redman*, 768 F.3d at 637.  The presence of this clause was raised by California in its amicus brief.  The Seventh Circuit has found such clauses questionable "[b]ecause it's in the defendant's

interest to contest that request in order to reduce the overall cost of the settlement, the defendant won't agree to a clear-sailing clause without compensation—namely a reduction in the part of the settlement that goes to the class members, as that is the only reduction class counsel are likely to consider." *Redman*, 768 F.3d at 637.

Clear-sailing clauses are found mainly in cases such as the present one in which the value of the settlement to the class members is uncertain because it is not a cash settlement, which complicates the difficulty faced by the district court in determining an appropriate attorneys' fee, and a clear-sailing clause exacerbates the difficulty further by eliminating objections to an excessive fee by the defendant. See *Redman*, 768 F.3d at 637. Clear-sailing clauses have not been held to be unlawful per se, but at least in a case such as this, involving at least a partial non-monetary settlement award to the class, such a clause should be subjected to intense critical scrutiny by the district court. See *Redman*, 768 F.3d at 637.

The court, taking into account that Defendants have agreed not to oppose the $2.2 million attorneys' fee request, finds that the clear-sailing clause does not undermine the court's determination that class counsel should receive the entirety of their fee request. For all the reasons stated throughout this order, the court finds that the settlement in this matter was reached as a result of an arms' length negotiation, and that there has been no evidence or suggestion of collusion between the parties.

74

Further, and crucially important in this case, the settlement and attorneys' fees award was overseen and subject to the approval of third-party mediator Professor Green. The court will not again go into Green's impressive qualifications and experience in mediating class action litigation. However, the court would note that § XI.A of the settlement states that Defendants would only agree not to oppose the application for $2.2 million in attorneys' fees until Professor Green indicated his satisfaction with the $1.1 million lodestar amount in fees and costs.

Indeed, on October 22, 2019, three days before Plaintiffs filed the instant motion, Professor Green sent a letter to both parties' counsel indicating that he had "received time and expense information from Settlement Class Counsel" in a form he found acceptable, that he had reviewed that information, and that he was "satisfied that Plaintiffs' counsel's lodestar at reasonable hourly rates for the necessary work performed in resolving this matter exceeds $1,100,000." Professor Green's involvement, as a neutral third-party mediator intimately familiar with the law and facts of the case, and the work put in by class counsel in resolving the matter, buttresses the court's conclusion that Defendants' agreement not to contest the attorneys' fees sought by Plaintiffs was not out of any collusive agreement to reduce the relief available to the class members, but rather was due to Defendants' confidence in the fairness and judgment of Professor Green on the reasonableness of the sought after attorneys' fees. See *Wong*, 773 F.3d at 864; see also *Pearson* 772 F.3d at 781-82 ("It might make sense for the district judge in a large class action suit like this to appoint an independent auditor,

on the authority of Fed.R.Evid. 706, to estimate the reasonableness of class counsel's

billing rates."). No such third-party mediator approved of the attorneys' fees in

*Redman*, where the Seventh Circuit found the clear-sailing clause so troubling. See

*Redman*, 768 F.3d at 627-30, 637; *Redman v. RadioShack Corp.*, 2014 WL 497438, at *6, 9-13

(N.D. Ill. Feb. 7, 2014). Fees are awarded as requested in full.

    III.    CONCLUSION

    For the forgoing reasons, the Motion for Final Approval of Class Action

Settlement (#54) and Motion for Award of Attorneys' Fees to Class Counsel and for

Incentive Awards to Class Representatives (#47) are GRANTED in their entirety. The

objections are DENIED.

    IT IS THEREFORE ORDERED:

(1)    The Motion for Final Approval of Class Action Settlement (#54) is
GRANTED. Judgment is entered in favor of Plaintiffs and against
Defendants. The clerk is directed to enter the attached Final Order and
Judgment attached as Exhibit 1 to (#54).

(2)    Plaintiffs' Motion for Award of Attorneys' Fees to Class Counsel and for
Incentive Awards to Class Representatives (#47) is GRANTED. Class
counsel is awarded $2.2 million in attorneys' fees and named Plaintiffs are
awarded $5,000 each in incentive awards.

(3)     This case is terminated.


ENTERED this _____ day of _____, 2020.
                    23rd                June


s/ COLIN S. BRUCE
U.S. DISTRICT JUDGE